Filed 6/9/26  P. v. Lewis CA4/1

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D087168 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SWF2201442) |
| CAMERON HUNTER LEWIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Louis R. Hanoian and Frederick Paul Dickerson III,[*] Judges.  Reversed with instructions.

Matthew M. Johnson, under the appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Chief Assistant Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Namita Patel, for Plaintiff and Respondent.

---

[*]     Retired judges of the San Diego Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Cameron Hunter Lewis left his car in the public parking lot of a healthcare facility with its trunk ajar. Loose ammunition and shooting targets, all legal, were visible inside its the locked passenger cabin. But a security guard for the facility was sufficiently concerned that he called the sheriff's department. The sheriff's deputy who responded to the call looked inside the partially open trunk and could see a tactical vest commonly associated with law enforcement and firearms. He opened the trunk, seized the vest, and found a pistol and high-capacity magazines in its pockets.

Lewis pleaded guilty to several offenses stemming from this seizure, but he now appeals the order denying his two-part motion to suppress claiming there was no probable cause to open the trunk and seize the vest because nothing incriminating about it could be seen until *after* it was taken from the trunk. The trial judge who presided over the second hearing and ultimately denied the renewed suppression motion disagreed. In his view, the deputy provided credible testimony at the first hearing that he thought he saw a gun in the vest before opening the trunk, and this was enough to validate the search and seizure.

It is true the deputy initially testified that through the gap in the partially open trunk he saw what "looked like the butt of a pistol in the tactical vest." However, on both cross and redirect examination across two hearings, the deputy clarified that while he could see the vest through the crack, he did not notice the butt of the gun until he opened the trunk. Thereafter, two different prosecutors (at the first and second hearing) and the trial court (at the first hearing) accepted that the deputy did not believe he saw the butt of a pistol until after he fully opened the trunk. On this record, the deputy's initial-but-later-clarified testimony does not provide substantial

evidence that the butt of a pistol could be seen in plain view inside the partially open trunk.  Accordingly, we must reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

After the court denied his motion to suppress, in May 2024 Lewis pleaded guilty to gun- and drug-related charges stemming from the discovery of an unsecured handgun, a loaded assault rifle, and four high-capacity rifles magazines during a warrantless search of the trunk of his car.[1]  He was sentenced to formal probation with the condition that he serve 180 days in local custody.[2]

The weapons and rifle magazines were found while Lewis's car was parked in a lot outside a Temecula health care clinic in August 2022.  Lewis reverse parked his car into a corner spot adjacent to the building with no other cars nearby.  Between the spot and the building was a row of plants, to the right of which were what appear to be utility boxes and to the left of which were more plants.  There was no sidewalk or other pedestrian path between the parking spot and the building.

A clinic security guard noticed that the trunk of the car was partially open and that shooting targets and loose ammunition were visible in its

---

[1]     The charges were:  possession of an assault weapon (Pen. Code, § 30605, subd. (a)), carrying a concealed firearm within a vehicle under his control (*id.*, § 25400, subd. (a)), possession of four large-capacity magazines (*id.*, § 32310), being under the influence of a controlled substance while in possession of a loaded firearm (Health & Saf. Code, § 11550, subd. (e)), being under the influence of a controlled substance (*id.*, subd. (a)), and possession of an opium pipe (*id.*, § 11364, subd. (a)).

[2]     This appeal following a guilty plea is expressly permitted by Penal Code section 1538.5, subdivision (m).

passenger compartment. He called the Riverside County Sheriff's Department to investigate.

Deputy Gregory Eastwood was one of at least three deputies who responded to the call. After seeing the targets and ammunition in the locked passenger compartment of the car, Eastwood looked inside the trunk from the side through the gap created by the partially open lid. He was able to see a tactical vest like those worn by law enforcement officers.

Without obtaining a warrant, Eastwood opened the trunk and retrieved the vest. He found a handgun and four high-capacity rifle magazines tucked into its pockets. It was unlawful for Lewis to leave a firearm unsecured in his unattended car (Pen. Code, § 25400, subd. (a)) or to possess high-capacity magazines (*id.*, § 32130, subd. (a)). Believing these discoveries authorized a search of the trunk for more weapons, another deputy found a loaded assault rifle—also illegal for Lewis to possess (*id.*, § 30605)—in a rifle bag near where the tactical vest had been lying.

Shortly thereafter, deputies confirmed that Lewis was the registered owner of the car, identified him as a patient in the clinic, arrested him in an examination room, and found drugs and drug paraphernalia in his car. Before Lewis was arrested, deputies told him that they wanted to talk about unspecified "objects" and "stuff" in his trunk, which caused him to become visibly upset. They also found the key to the car in Lewis's pocket during a pat down search.

Shortly after the preliminary hearing, Lewis unsuccessfully moved to suppress the evidence deputies gathered from his trunk and the fruits of that allegedly illegal search. The motion was heard by Judge Louis R. Hanoian and denied. After the People belatedly produced the footage from Eastwood's body worn camera (bodycam) and the case was set for trial, Lewis renewed

4

his suppression motion before the assigned trial judge, Judge F. Paul Dickerson III.  In denying Lewis's renewed motion, the court acknowledged that he had a reasonable expectation of privacy in the trunk of his car, but found that the seizure of the vest and its contents were authorized under the plain view doctrine.  According to the court, Eastwood credibly testified that he saw an unsecured gun in the vest while the trunk was only partially open.

## DISCUSSION

Lewis claims that the record does not contain substantial evidence to support the court's finding that Eastwood credibly testified the gun was in plain view while the trunk was only partially open.  Thus, Lewis contends, the deputy was not authorized to seize the vest and its contents without a warrant, the first in what he believes was a series of illegal discoveries of incriminating evidence.  The People respond that even if Lewis had an expectation of privacy in his partially open trunk, we must accept the trial court's challenged credibility finding and conclude that the search and seizure was justified by the plain view doctrine.[3]  Alternatively, the People contend that the warrantless seizure of the vest was a reasonable exercise of the deputies' community caretaking function to keep the public safe from unsecured firearms.

In reviewing an order on a suppression motion, "we rely on the trial court's express and implied factual findings, provided they are supported by substantial evidence, to independently determine whether the search was constitutional." (*People v. Lee* (2019) 40 Cal.App.5th 853, 860 (*Lee*).)  "

---

[3]    The Attorney General does *not* argue that the entirely legal firearms-related items concededly in plain view (targets, loose ammunition and the tactical vest) created probable cause to believe an illegal weapon would be found in the trunk.

'Thus, while we ultimately exercise our independent judgment to determine the constitutional propriety of a search or seizure, we do so within the context of historical facts determined by the trial court' " construed in the light most favorable to the court's order. (*Id.* at pp. 860–861.) "It is the trial court's role to evaluate witness credibility, resolve conflicts in the testimony, weigh the evidence, and draw factual inferences." (*Ibid.*)

The Fourth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, prohibits the police from conducting unreasonable searches and seizures of private property. (*People v. Ramirez* (2007) 148 Cal.App.4th 1464, 1469.) A defendant challenging the lawfulness of a warrantless search must establish a reasonable expectation of privacy in the area searched or the things seized. (*People v. Nishi* (2012) 207 Cal.App.4th 954, 960 (*Nishi*).) A successful showing requires the government to respond by identifying an applicable exception to the warrant requirement. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1156.) If the government fails to do so, the court must apply " 'an exclusionary rule that … forbids the use of improperly obtained evidence at trial' " and must also preclude " '[t]he introduction into evidence of materials and testimony which are the products or indirect results of the illegal search.' " (*People v. Golden* (2017) 19 Cal.App.5th 905, 911.)

## A. *Lewis's Expectation of Privacy*

The People first claim that Lewis lacked standing to challenge the warrantless seizure of the vest. In their view, he could not have a reasonable expectation of privacy in the unsecured partially open trunk of his car because its contents were accessible to any passersby. A defendant's expectation of privacy must be both subjective and objectively reasonable. (*Nishi*, *supra*, 207 Cal.App.4th at p. 960.) To meet this second prong of the

6

test, the expectation " 'must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.' " (*Byrd v. United States* (2018) 584 U.S. 395, 405 (*Byrd*).)

The court's determination that Lewis had a reasonable expectation of privacy in the trunk of his car is supported by substantial evidence. At the time of the search, the doors to Lewis's car were locked and the key was in his pocket. These facts are highly relevant to our inquiry because " '[o]ne of the main rights attaching to property is the right to exclude others,' and, … 'one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude.' " (*Byrd, supra,* 584 U.S. at p. 405.) Accordingly, "[o]ne who owns and possesses a car, like one who owns and possesses a house, almost always has a reasonable expectation of privacy in it." (*Id.* at p. 404.)

To the People's point, the facts indicate that Lewis took " 'precautions customarily taken by those seeking privacy.' " (Cf. *United States v. Ramapuram* (4th Cir. 1980) 632 F.2d 1149, 1156 [no expectation of privacy in broken trunk of a junked car in an open field].) Lewis told deputies that his key fob was broken and that he knew his trunk was open. When considered in this context, Lewis's decision to reverse park his car into a spot that was away from other cars, had no walkway behind it, and was next to a row of plants that abutted the clinic building are actions consistent with an attempt to protect the privacy of his trunk.

## B. *Plain View Doctrine*

It does not violate the Fourth Amendment for an officer to make a warrantless seizure of an incriminating object in plain view if "(1) the officer was lawfully in a place where the object could be viewed; (2) the officer had a

7

lawful right of access to the seized item; and (3) the item's evidentiary value was immediately apparent." (*People v. Caro* (2019) 7 Cal.5th 463, 489.) This third element requires that there be "probable cause to believe that the item in question is evidence of a crime or contraband" before it was seized. (*People v. Stokes* (1990) 224 Cal.App.3d 715, 719 (*Stokes*).)

Much of Judge Dickerson's application of the plain view doctrine is appropriately unchallenged on appeal. Lewis does not dispute that its first two requirements are met. He instead argues the record does not support the court's finding that Eastwood saw the gun in the vest *before* he opened the trunk. Thus, proper application of the plain view doctrine largely turns on whether there is substantial evidence to support Judge Dickerson's finding that Eastwood credibly testified to seeing the gun in the vest before the trunk was fully opened.

1.   *The First Hearing*

Judge Hanoian conducted the hearing on Lewis's initial motion in October 2023. On direct examination, Eastwood began by describing his arrival on the scene, where he found the car the security guard thought was suspicious and saw a tactical vest in the partially open trunk.[4] When asked what he could see in the vest before opening the trunk, the deputy responded, "It had some magazines, some – it looked like the butt of a pistol in the tactical vest." At that point, he testified, he opened the trunk and retrieved the vest "in the interest of public safety," specifically to secure the handgun to prevent someone from taking it.

---

[4]   Certain persons may not own, possess, or maintain custody or control over ammunition. (Pen. Code, § 30305, subd. (a)(1)–(b)(1).) It does not appear that Lewis was such a prohibited person or that deputies thought otherwise when they responded to the call.

8

That was the only time Eastwood testified to seeing a gun in the tactical vest before he opened the trunk. He clarified on cross-examination:

> "[Q:] Could you identify that there was a firearm from when you first looked, before you opened—before you opened the trunk?
>
> "[A:] Before I opened the trunk?
>
> "[Q:] Yes.
>
> "[A:] No."

A few moments later, Eastwood was asked to confirm whether he saw the tactical vest before opening the trunk. the deputy answered in the affirmative and then spontaneously added, "I didn't see the handgun in the [tactical vest] is what I remember." He repeated that testimony on redirect examination. Apparently satisfied with Eastwood's clarifications, the prosecutor accepted them as the truth when arguing against Lewis's suppression motion.

Judge Hanoian declined to suppress the evidence seized from the trunk. He found that Lewis did not have a reasonable expectation of privacy in the open trunk of his car but, even if he did, the warrantless seizure of the vest and its contents was justified under either the plain view doctrine or the exigent circumstances exception to the warrant requirement. The court supported its latter rulings with findings that Eastwood saw the vest and clips in the partially open trunk. But it also specifically found that "[h]e didn't see the gun until he opened it further."

2.    *The Second Hearing*

Lewis renewed his motion to suppress because footage from Eastwood's bodycam was provided to the defense after the previous hearing. Judge Dickerson entertained Lewis's renewed motion in May 2024. In addition to a

9

new judge, the People were represented at this hearing by a different prosecutor. Before the hearing, the judge reviewed footage from Eastwood's and another deputy's bodycams and the transcript of the earlier hearing, all of which were admitted into evidence.

On direct examination, Eastwood set the scene as he did before, albeit with more detail. He repeated his testimony that he could see the back of the tactical vest in the partially open trunk. When combined with the loose ammunition and targets in a car that was "backed into the corner of the parking lot at a medical facility," this led him to believe he could open the trunk to address a potential active shooter situation.[5] He went on to explain, "I believe I picked up the vest, and that's, I believe, when I saw the butt of a handgun in the vest." He also testified that he found the rifle magazines in the vest after he removed it from the trunk and only then determined that they were illegal to possess.

The footage from Eastwood's bodycam corroborated his testimony about seizing the vest and discovering its contents. He turned on the video capture function after the trunk lid of Lewis's car was already fully open. The video depicts the vest lying in the trunk with neither the magazines nor the butt of a gun visible. Eastwood switched on the audio capture function after he picked up the vest but before he examined the magazines. The deputy announced that the magazines were empty but did not mention that he thought he saw a gun in the vest.

---

[5] The court did not find Eastwood's testimony about a potential active shooter credible because the evidence showed that none of the deputies exhibited the kind of urgency one would expect of a law enforcement officer who genuinely thought a shooting might be imminent. We agree with this finding and thus do not consider this testimony.

A few seconds after examining the magazines, Eastwood placed the vest on the hood of Lewis's car in an orientation where what turned out to be the butt of the gun is visible. But rather than reach for the possible weapon immediately, the deputy spent a few seconds poking at other compartments of the vest. Evidently satisfied that they contained nothing of interest, Eastwood then retrieved the pistol and exclaimed, "Oh boy!" The deputy agreed that this exclamation indicated that the discovery took him by "surprise," as if "that's the first time [he was] seeing it."

Before playing Eastwood's bodycam video, defense counsel referenced his testimony from the first hearing that he could see the magazines and butt of the pistol before he opened the trunk:

> "[Q:] At the prior hearing, you testified that, when you looked in the gap and you identified the tactical vest, and you testified that you identified that there were magazines and potentially the butt of a gun in it; correct?
>
> "[A:] Yes.
>
> "[Q:] At that point in time, prior to opening the trunk; correct?
>
> "[A:] Yes.
>
> "[Q:] Okay. Is that your belief of what occurred?
>
> "[A:] Well, I testified to that last time. But that's—I testified last time after I reviewed the body camera. I haven't reviewed the body camera in eight months. So … ."[6]

---

[6]    Counsel did not follow up on whether Eastwood believed that he saw the gun before opening the trunk.

11

Later on redirect examination, however, Eastwood confirmed that he also previously testified that he did not "believe [he] noticed the butt of the gun until after [he] opened" the trunk.

While arguing Lewis's motion, the prosecutor—like his colleague during the first hearing—characterized Eastwood as having testified that that he did not see the gun until he took the vest out of the trunk. The court asked the prosecutor to reconcile that interpretation with the deputy's testimony during the first hearing that he saw the handle of the pistol before opening the trunk. In response, the prosecutor cited some of Eastwood's clarifying testimony withdrawing that assertion.

Like Judge Hanoian, Judge Dickerson also denied Lewis's motion, although he relied on a different rationale. According to Judge Dickerson, Lewis had a reasonable expectation of privacy in his car because he was arrested with its key in his pocket and there was paperwork in the car belonging to him. But the court concluded that the warrantless seizure of the vest and its contents were justified under the plain view doctrine because Eastwood credibly testified during the first hearing that he could see a gun in the vest before he opened the trunk. The seizure of the unsecured pistol and high-capacity magazines, in turn, gave deputies probable cause to examine the rifle bag that was also in the trunk.

The court explained its rationale for crediting Eastwood's testimony that he saw a gun before opening the trunk:

> "I thought he did his very best. The inflection in his voice was certain when he was certain. When he wasn't sure, he actually said to the Court, 'I wasn't sure.' He admitted that he made a couple of different inconsistent statements at the prior hearing.

"But what he never did, Mr. Fox [prosecutor], was say he didn't see the butt of a pistol. What he said was—and this was his first statement—as both of you know, having done this work a long time, people can get confused; right? You've got one attorney asking you questions, then another, then the other attorney, then the other, then the other. And you don't even know your name by the end of the hearing. His first statement was—and you actually asked him this, Mr. Donath [defense counsel]. 'At the previous hearing, you recall testifying that when you looked in the trunk prior to opening the trunk in any way, you told the Court that you can see the tactical vest with magazines and what appeared to be the butt of a pistol?'

"His answer was unqualified, and I heard it in his voice, 'Yes.' He never qualified that to say, 'I was mistaken.' That was the sworn testimony, and the Court finds him credible. Because the appellate Court, if it goes up, they only have the transcript. I heard how he testified, and I find him to be credible.

"As far as which statement to believe, this is what happens in jury trials all the time. The trier of fact has to decide which statement, if any, to believe.

"In the opinion of this Court, Mr. Fox [prosecutor], I believe his initial statement was probably most accurate. He looked in, he saw the vest, he saw what he believed to be magazines and what appeared to be the butt of a gun. And that's corroborated. Because when he takes out the vest, it has a gun in the vest, and there are magazines. It's corroborated. What he saw is what he saw, and there's evidence for it."

3.    *The Trial Court's Credibility Finding*

Under the substantial evidence standard of review, we defer to a trial court's credibility finding that is supported by substantial evidence. (*Lee*, *supra*, 40 Cal.App.5th at pp. 860–861.) Generally, this is "evidence which, when viewed in light of the entire record, is of solid probative value,

13

maintains its credibility and inspires confidence that the ultimate fact it addresses has been justly determined." (*People v. Conner* (1983) 34 Cal.3d 141, 149.) Under this standard, we may reject testimony accepted as credible by the trial court only if it is " ' "wholly unacceptable to reasonable minds" [or] "unbelievable *per se*" [citation] such that "no reasonable person could believe the testimony." ' " (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1149.) Credibility findings that fail to survive this scrutiny "are rare indeed." (*DiQuisto v. County of Santa Clara* (2010) 181 Cal.App.4th 236, 261 [" 'there must exist either a physical impossibility that they are true, or [the statements'] falsity must be apparent without resorting to inferences or deductions' "].)

This case presents one of these rare occurrences. Eastwood testified once, at the beginning of the first hearing, that he saw a gun in the vest before he opened the trunk. Every other time the issue came up, however, he clarified that he did *not* recall seeing the handgun in the vest until *after* he opened the trunk. This clarification was fully consistent with the footage from Eastwood's bodycam, including his "Oh, boy!" exclamation he admitted indicated surprise at the discovery of the gun. Indeed, the testimony that Eastwood did not see the gun in the partially open trunk was so clear that the prosecutors who handled both hearings accepted it as true. On this record, we cannot accept the trial court's finding that a snippet of testimony Eastwood walked back several times was credible.

We are unpersuaded to read the record differently based on the trial judge's theories that Eastwood's clarifications were the result of confusion or that his one failure to spontaneously correct his initial testimony means that he really did see the gun. Nothing in the deputy's testimony indicates that he failed to understand the questions he was being asked. Nor do we see why

14

yet another clarification of this point was necessary. And so while it is true, as Judge Dickerson stated, that as the trier of fact he was to resolve evidentiary conflicts and could take witness demeanor into account when doing so, there was no confusion to address or contradiction to reconcile. Rather, the deputy's testimony about the gun *as repeatedly clarified and understood by all the advocates in the courtroom during both hearings* was consistent, not in conflict, with the other evidence.

Finally, the trial court's rationale that Eastwood's testimony about seeing the gun in the vest before opening the trunk must have been true because he later found a gun diminishes the protections of the Fourth Amendment. Under the plain view doctrine, probable cause that an item of interest to law enforcement is incriminating must exist *before* the object is seized. (*Stokes, supra*, 224 Cal.App.3d at p. 719.) The trial court's logic, by contrast, suggests that this standard can be met by a mere hunch that happens to pan out. That is not how the Fourth Amendment works. (*People v. Pitts* (2004) 117 Cal.App.4th 881, 889 [" 'A hunch may provide the basis for solid police work… . A hunch, however, is not a substitute for the necessary specific, articulable facts required to justify a Fourth Amendment intrusion' "].)

Having set aside the trial court's finding that Eastwood credibly testified he saw an unsecured gun in the trunk before he opened it, we must

conclude that the court erred in applying the plain view doctrine to deny Lewis's motion to suppress.[7]

## C. *Community Caretaking Function*

In the alternative, the People contend that Eastwood's warrantless search of Lewis's trunk was proper because protecting the public from unsecured firearms falls under a law enforcement officer's "community caretaking functions."[8]  Relying heavily on *Cady v. Dombrowski* (1973) 413 U.S. 433, 441 (*Cady*) and *People v. Vodak* (1980) 105 Cal.App.3rd 1014 (*Vodak*), the People contend that these functions include warrantless searches of cars in public places to address concerns about weapons.  In the circumstances of this case, we disagree.

A law enforcement officer often performs functions that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  (*Cady*, *supra*, 413 U.S. at p. 441.) As these so-called community caretaking functions relate to vehicles, they

---

[7]     Lewis argues that Eastwood could not have seen the magazines before he opened the trunk and, even if he could, the deputy testified that he could not have known they were illegal to possess until he seized them.  Thus, Lewis concludes, they could not provide probable cause to seize the vest. The People concede this point, as they focus on Eastwood's testimony about the gun and only mention in passing the magazines he also claimed to see. We therefore need not address this aspect of the deputy's testimony.

[8]     The trial court did not rule that the community caretaking exception applied.  Accordingly, if there were potential merit to the People's argument and the underlying facts were disputed, a remand would be required so that the trial court could address this issue in the first instance and make appropriate factual findings.  (See *People v. Bowers* (2004) 117 Cal.App.4th 1261, 1273 [case remanded for court to consider additional theories justifying the search]; *People v. LeBlanc* (1997) 60 Cal.App.4th 157, 168 [same].) We reach this issue here because there is no dispute as to the underlying facts.

include impounding them if they pose threats to public safety—for example, because they are disabled, parked illegally, or blocking traffic or a sidewalk—or stand at risk of theft or vandalism. (*Lee*, *supra*, 40 Cal.App.5th at p. 867.) " 'When vehicles are impounded,' " that is, seized, " 'local police departments generally follow a routine practice of securing and inventorying the automobiles' contents.' " (*People v. Duong* (2020) 10 Cal.5th 36, 52.) These inventory searches are "a well-defined exception to the Fourth Amendment's warrant requirement." (*Lee*, at p. 867.) Accordingly, under what is sometimes referred to as the vehicle "community caretaking exception" (*People v. Ovieda* (2019) 7 Cal.5th 1034, 1053 (*Ovieda*)), the government may introduce evidence obtained from an inventory search of a lawfully impounded vehicle. (*Lee*, at p. 867.)

We start with the fact that controlling precedent recognizes the vehicle community caretaking exception applies only in the context of impound procedures, which undisputedly were not used here. (*Ovieda, supra*, 7 Cal.5th at p. 1048 ["no published California case … has applied the concept of community caretaking outside the context of a vehicle inventory"]; *id.* at p. 1053 [the United States Supreme Court "has only recognized community caretaking searches in the context of impound procedures"].) In *Cady*, the high court rejected a challenge to a warrantless search for a gun in a car that was in the police's constructive custody, therefore it does not help the People's case. (*Cady*, *supra*, 413 U.S. at pp. 442–443, 447–448.) And neither does *Vodak* despite that it bears some similarity to the facts here—officers found loaded guns in the trunk of a car that had not been impounded after observing loose shotgun shells in its passenger cabin. (*Vodak*, *supra*, 105 Cal.App.3d at pp. 1016–1018.) The warrantless search in *Vodak* was upheld

17

based on the existence of probable cause; there was no mention of the community caretaking exception. (*Ibid.*)

The absence of established law supporting the People's position does not end our inquiry, however, because California courts have suggested they might be open to expanding the vehicle community caretaking exception beyond the impound context. For example, in *People v. Madrid* (2008) 168 Cal.App.4th 1050, 1057–1058, 1061, the Court of Appeal wrote, "[A]ssuming that the community caretaking exception may justify the stop of a moving vehicle, we conclude that given the facts[,] … a reasonable officer would not have perceived a need to do so in this case."

Turning to the People's argument, we can imagine hypothetical situations where a warrantless entry into the trunk of an unoccupied car in a public lot would be reasonable under this exception, such as where police credibly believe it contains a live explosive device. But reasonableness was lacking for the warrantless search of Lewis's trunk because there were obvious and plainly less intrusive methods for addressing the deputy's concern that someone could gain access to firearms that might be located there.[9] The simplest solution to address this perceived danger, while also protecting Lewis's privacy interests, would have been for one of the *three* on-scene deputies to watch the car while the others attempted to locate Lewis inside the clinic so that *he* could be asked to secure the trunk. Indeed, locating Lewis is precisely what the deputies successfully accomplished in

---

[9] We likewise reject any suggestion that a search of Lewis's trunk would have been reasonable under the exigent circumstances exception to the warrant requirement. Considering the presence of multiple deputies on the scene, there was no risk that the car would be moved or that Lewis or someone else would access the trunk and take a weapon officers thought it might contain.

18

just a few minutes, but only *after* Eastwood opened the trunk and found the firearms.

In short, even assuming that the community caretaking function might in some circumstances permit a warrantless search for suspected firearms in the unsecured trunk of an unoccupied car in a public place, the search here was unreasonable because sheriff's deputies made no attempt to first locate the driver of the vehicle before opening the trunk.

## DISPOSITION

The judgment is reversed. The matter is remanded with directions to (1) vacate the order denying Lewis's suppression motion and enter a new order granting it; (2) permit Lewis to withdraw his guilty plea by appropriate motion within 30 days after this opinion becomes final.


DATO, J.


I CONCUR:


KELETY, J.


19

O'Rourke, J., Dissenting.

I respectfully dissent.  Sheriff's deputies called to a public medical facility parking lot came upon Lewis's unoccupied, locked vehicle with a partially open trunk lid.  Shooting targets, high-powered assault rifle ammunition, a knife and other shooting paraphernalia were in plain view on the front passenger seat.  One deputy peered into the trunk and saw a tactical vest akin to those worn by police.  Was the deputy's decision to search the open trunk without first obtaining a warrant reasonable under the Fourth Amendment?  In my view, the obvious answer is yes.  This is so because (1) Lewis had no expectation of privacy in the open trunk of his car parked in a public lot; and (2) the search was justified by the automobile or exigency exceptions to the warrant requirement.  Reviewing courts may affirm a suppression ruling if it is correct on any theory, even if the lower court's reasoning was incorrect.  (*People v. Perez* (2026) 119 Cal.App.5th 345, 358; *People v. Hall* (2020) 57 Cal.App.5th 946, 952.)  I cannot agree with the majority's approach, which elects to improperly reject the court's reasoned and carefully articulated credibility findings.  Thus, I would affirm the order denying Lewis's motion to suppress on the grounds stated above.

A warrantless search of Lewis's trunk "would violate the Fourth Amendment only if [Lewis] manifested a subjective expectation of privacy in [it] that society accepts as objectively reasonable."  (*California v. Greenwood* (1988) 486 U.S. 35, 39 [addressing garbage bags left on the street].)  Thus, to invoke Fourth Amendment protection, Lewis " ' "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." ' [Citation.]  ' "In other words, [he] must show that he . . . had a subjective expectation of privacy that was objectively

1

reasonable." ' " (*People v. Cartwright* (2024) 99 Cal.App.5th 98, 102, in part quoting *People v. Ayala* (2000) 23 Cal.4th 225, 255; see also *People v. Hochanadel* (2009) 176 Cal.App.4th 997, 1020.)  "The 'reasonableness of a claimed expectation of privacy depends on the totality of circumstances presented in each case.' " (*Hochanadel*, at p. 1020.)  Lewis bears the burden of showing he had a legitimate expectation of privacy in his vehicle trunk. (*Ibid*.)

I cannot agree he met this burden, and would conclude the court's conclusion otherwise[1] is unsupported by substantial evidence.  The United States Supreme Court has long held that individuals have a reduced expectation of privacy with respect to vehicles:  " '[T]he expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office.' " (*California v. Carney* (1985) 471 U.S. 386, 391; see also *Terrence Byrd v. United States* (2018) 584 U.S. 395, 403; *Pennsylvania v. Labron* (1996) 518 U.S. 938, 940; *People v. Schmitz* (2012) 55 Cal.4th 909, 919 ["Homes and cars are afforded different levels of Fourth Amendment protection"].)  That Lewis left his car unattended in a public parking lot, with the trunk lid unlocked and ajar, rendered any expectation of privacy he may have had in the truck area objectively unreasonable.  The majority points out that Lewis otherwise locked the car, and backed it into plants, "actions consistent with an attempt to protect the privacy of his trunk." (Maj. opn., *ante*, at p. 7.)  But this shows only that Lewis maintained a *subjective* expectation of privacy; it does not demonstrate such an expectation is

---

1    The court's ruling on this point was cursory and unreasoned:  "[F]irst, the Court has to find that Mr. Lewis had a legitimate expectation of privacy in the car; otherwise, he doesn't have standing, obviously.  The Court finds he did have standing."

2

objectively reasonable. It is not. For this reason alone, the order denying Lewis's suppression motion should be affirmed.

But I would in any event hold the officer's search of the trunk under these circumstances was reasonable and did not violate the Fourth Amendment. " 'The touchstone of the Fourth Amendment is reasonableness.' [Citation.] 'The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are *unreasonable*.' [Citation.] When analyzing the reasonableness of a particular search or seizure, 'it is imperative that the facts be judged against an objective standard.' " (*People v. Ramirez* (2024) 104 Cal.App.5th 315, 326, quoting *Florida v. Jimeno* (1991) 500 U.S. 248, 250.) " 'Warrantless searches "are *per se* unreasonable under the Fourth Amendment" ' " but that principle is subject to " ' "specifically established and well-delineated exceptions." ' " (*Sellers v. Superior Court* (2026) 19 Cal.5th 75, 89; *People v. Lopez* (2019) 8 Cal.5th 353, 359.) " 'Whether a particular kind of search is exempt from the warrant requirement ordinarily depends on whether, under the relevant circumstances, law enforcement's need to search outweighs the invasion of individual privacy.' " (*Sellers*, at p. 89.)

One such exception to the warrant requirement is the automobile exception. Under that exception, " 'an officer may search a vehicle if the officer has probable cause to believe that evidence of a crime will be found inside.' " (*People v. Sellers*, *supra*, 19 Cal.5th at p. 89; see *People v. Lopez*, *supra*, 8 Cal.5th at p. 372; *People v. Lee* (2019) 40 Cal.App.5th 853, 861.) "The exception has been justified by 'the ease with which an automobile might be moved out of the jurisdiction before a warrant can be obtained.' "

(*Sellers*, at p. 89; *Lee*, at p. 861.)[2]  A court must assess the "totality of the circumstances" to determine whether they give rise to probable cause. (*Sellers*, *supra*, 19 Cal.5th at p. 89; *People v. Leal* (2023) 93 Cal.App.5th 1143, 1151.)  "Our review is limited to the facts and circumstances known *to the searching officer*.  [Citation.]  '[P]robable cause [to] search exists when an officer is aware of facts that would lead a [person] of ordinary caution or prudence to believe, and conscientiously to entertain, a strong suspicion that the object of the search is in the particular place to be searched.' "  (*Leal*, at p. 1151.)[3]

The automobile exception generally justifies a warrantless search of a vehicle trunk "in three categories of circumstances: (1) officers have probable cause to believe contraband or evidence of a crime will be found specifically

---

[2]	The U.S. Supreme Court originally grounded this exception in the "ready mobility" aspect of a vehicle.  (*Collins v. Virginia* (2018) 584 U.S. 586, 591; *California v. Carney, supra,* 471 U.S. at p. 390; *Pennsylvania v. Labron, supra,* 518 U.S. at p. 940 ["Our first cases establishing the automobile exception to the Fourth Amendment's warrant requirement were based on the automobile's 'ready mobility,' an exigency sufficient to excuse failure to obtain a search warrant once probable cause to conduct the search is clear"].)  But the U.S. Supreme court has since articulated further justification for the "less rigorous warrant requirements" based on the lessened expectation of privacy with respect to vehicles.  (*Carney*, at p. 391; see also *Pennsylvania v. Labron*, at p. 940.)  "Even in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception."  (*Carney*, at p. 391.)

[3]	" '[W]here probable cause to search a vehicle under the automobile exception exists, " 'a law enforcement officer may search the vehicle "irrespective of whether [the offense] is an infraction and not an arrestable offense." ' " '  [Citation.]  Moreover, '[w]here the court finds that officers have probable cause to search, the officer's subjective intent in performing the search is irrelevant.' "  (*In re Randy C.* (2024) 101 Cal.App.5th 933, 937.)

in the trunk . . . ; (2) a search of the passenger compartment reveals contraband or other evidence generating further probable cause to search the trunk . . . or (3) probable cause exists as to the entire car (i.e., that the contraband or evidence of a crime will be found somewhere in the car)." (*People v. Leal, supra*, 93 Cal.App.5th at pp. 1151-1152.)  The question is whether the facts " 'warrant a prudent man in believing' that a firearm or any other contraband would be found in the trunk." (*Leal*, at pp. 1153-1154; see, e.g., *People v. Vodak* (1980) 105 Cal.App.3d 1014, 1017 [officers' discovery of shotgun shells on the floor of a vehicle car and an expended shotgun shell under it "amply supports the conclusion that the police officer not only had probable cause to believe that [stolen] shotguns . . . were in the trunk, but that the weapons were loaded"].)  In *Leal*, it was not enough that officers saw an armed juvenile on searchable probation with a firearm restriction near the trunk of a car, or that officers received reports of juveniles armed with handguns around a vehicle, including its trunk.  (*Id*. at pp. 1148, 1149-1150, 1152-1153.)  "Being armed while standing *near* or *around* the trunk of a vehicle, without more, does not create probable cause to believe the weapon will be found *in* the trunk." (*Id*. at p. 1153.)

The circumstances are very different here.  Officers saw that Lewis's vehicle contained shooting paraphernalia, including a target, loose high-powered rifle ammunition and a knife.  One officer spotted a tactical vest through the gap of the partially opened trunk.  While in isolation, these items may not have been unlawful to possess, the facts in my view "would lead a man of ordinary caution or prudence to believe, and conscientiously to entertain, a strong suspicion that the object of the search is in the particular place to be searched" that is, such a man would strongly suspect that the vehicle's trunk contained a concealed weapon, a violation of Penal Code

5

section 24500.[4]  Though the circumstances here are not as obvious as those in *People v. Ramirez*, *supra*, 104 Cal.App.5th 314, in which an officer's plain view observation of a firearm in a car constituted objective probable cause that the driver was committing a violation of Penal Code section 24500 (*id.* at p. 328), here, the presence of shooting target, ammunition and a tactical vest all would strongly suggest to a reasonable officer that the vehicle likely contained a concealed firearm.  That there was a probability or substantial chance of criminal activity is sufficient.  (*New York v. P.J. Video, Inc.* (1986) 475 U.S. 868, 877 [" '[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity' "]; *People v. Diaz* (2023) 97 Cal.App.5th 1172, 1178 [same; "[p]robable cause is not a high bar"].)

" 'If there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross* [(1982) 456 U.S. 798, 820-821] authorizes a search of any area of the vehicle in which the evidence might be found.' " (*People v. Hochstraser* (2009) 178 Cal.App.4th 883, 902.)  I would hold under the automobile exception, the officers' search of Lewis's trunk was lawful.

Finally, I would hold the search was lawful under the exigent circumstances doctrine.  (*People v. Oveida* (2019) 7 Cal.5th 1034, 1041.)  That doctrine "describes ' " 'an emergency situation requiring swift action to prevent imminent danger to life' " ' "and is measured by the facts known to officers.  (*Ibid.*; see also *People v. Thompson* (2006) 38 Cal.4th 811, 818

---

[4]     "Conviction under [Penal Code section 24500] requires proof that the 'defendant carried within a vehicle a firearm capable of being concealed on the person,' the 'defendant knew the firearm was in the vehicle,' the 'firearm was substantially concealed,' and the 'vehicle was under the defendant's control or direction.' " (*People v. Aguilar* (2016) 245 Cal.App.4th 1010, 1017.)

[presumption of unreasonableness of a search can be overcome by the "risk of danger to the police or to other persons"].) "[E]xigent circumstances may exist where there is probable cause to believe a crime has been committed but 'an emergency leaves police insufficient time to seek a warrant.' " (*Ovieda*, at p. 1041.) "[T]he exigent circumstances exception applies to situations requiring prompt police action." (*Id.* at p. 1042.)

Such circumstances are present here, where, based on their view of the contents of Lewis's car and the tactical vest in his trunk, officers had probable cause to believe concealed guns would be present in the unlocked and open trunk of Lewis's car. Any reasonable officer would conclude there was an urgent and exigent need to open and search it to secure them from access by Lewis or the public.

My conclusions eliminate the need to address the credibility of the officer who peered into the trunk and whether he saw the butt of a firearm or the magazines in the vest. This was a topic of the parties' arguments, and the court made a very carefully reasoned credibility finding based on its view of the officer's certainty when he initially testified. But the majority second guesses this finding and replaces it with its own, contradicting settled law that the trial court is the exclusive judge of credibility, requiring we give deference to such findings. (*People v. Elliott* (2012) 53 Cal.4th 535, 585 [conflicting testimony or "even testimony which is subject to justifiable suspicion" does not require reversal, "[u]nless it describes facts or events that are physically impossible or inherently improbable"].) The court found "unqualified" and "very credible" the officer's initial sworn testimony that he saw what appeared to be the butt of a gun and magazines in the vest, and observed the officer never admitted he was mistaken on the point. It expressly found the officer's first statement was "most accurate" and

believable.  It is not the province of this court to reach its own credibility finding based on its review of the evidence, where the officer's testimony is not impossible or inherently incredible.



O'ROURKE, Acting P. J.